## WILLIAM H. CASSELL *v.* JACOB BACKRACK.

1. SALE OF PERSONAL PROPERTY: *WHEN TITLE COMPLETE, THOUGH POSSESSION NOT CHANGED.* — A sale of specific, designated chattels, at the time in the possession of a third person, and where the purchase-money is paid, vests in the purchaser a perfect and complete title, though the actual possession of the chattels was not changed.

2. CONFEDERATE STATES: NOT A GOVERNMENT DE FACTO OR DE JURE AS TO THE UNITED STATES OR ITS LOYAL CITIZENS. — The Confederate States of America, and the State governments organized under it, in relation to the United States and its loyal citizens, were not governments *de jure* or *de facto*, as these terms are used in the law of nations.

3. SAME: A GOVERNMENT DE FACTO AS TO ITS CITIZENS. — In reference to all matters of internal, private, and domestic import, not affected by the laws and constitution of the United States, and which have been completed and consummated, the Confederate government and State governments under it were governments in fact for the time being, for the purpose of protecting the rights of persons and property, and as an immunity to its citizens from liability and punishment for obeying the laws of such governments.

ERROR to the Circuit Court of Madison county. Hon. J. A. P. Campbell, judge.

Jacob Backrack sued W. H. Cassell for taking and carrying away two bales of cotton, on the 5th day of June, 1865, belonging to Backrack. The declaration contains two counts: the first in trespass, and the second in trover. Cassell pleaded the general issue, and gave notice, that under this plea he would prove, that about the 3d day of June, 1864, he purchased the two bales of cotton at a regular tax sale, made by a collector of taxes for the Confederate States government, for taxes due the Confederate States from Backrack, for certain cotton, of which the two bales were a part. Also notice of set-off, and accord and satisfaction.

The testimony for Backrack showed that, through an agent, Gazan, he had purchased the cotton in controversy from one N. H. Dinkins, and left it in his possession. That on the 5th. of June, 1865, Cassell came over to Dinkins and carried off the two bales. That the cotton was worth from one hundred and fifty to two hundred dollars per bale.

R. H. Gould, for Cassell — That he was a duly commissioned tax-collector of the Confederate States. That, in 1864, he levied on two bales of cotton of the lot purchased by Backrack from Dinkins, for unpaid taxes due from Backrack to the Confederate States, and sold the same at public auction to Cassell, who paid him the amount of the purchase. That the levy and sale were regularly made. The two bales sold were numbered 11 and 13, or 14.

Cassell testified — That he bought the cotton from Gould, tax-collector; that it remained at Dinkins, until he removed it in 1865. That he removed the two bales that he purchased from Gould.

Other testimony, not important to the questions presented in the opinion of the court, was adduced.

The instructions to the jury are contained in the opinion.

The jury returned a verdict in favor of Backrack, for $150.90. Motion for a new trial by Cassell, which was overruled. Writ of error to this court.

The errors assigned are,—

1. The giving of the instructions asked by defendant in error, and the refusal to give those asked by plaintiff in error.

2. The overruling of the motion for a new trial.

*Semmes & Cooper, John Handy,* for plaintiff in error.

This was action of trespass brought by Jacob Backrack against Wm. H. Cassell, for taking and carrying away two bales of cotton, on the 5th day of June, 1865, belonging to said Backrack. Cassell, the appellant, pleaded the general issue, defending the wrong and injury, when, &c., and says that he is not guilty of the said supposed grievances, and puts himself upon the country, and giving notice that under the general issue the de-

fendant would offer in evidence on his part, that at a tax sale, regularly conducted by the Confederate States tax-collector, for non-payment of certain taxes due the Confederate States government by the said Backrack, on certain cotton, of which these two bales were a part, he, the said Cassell, purchased the said two bales at said sale, and paid for the same, he being the highest and last bidder for said two bales of cotton. Upon the trial of this cause, after the evidence was all taken, the plaintiff in the court below asked for the following instructions, which were given; viz.: —

1st. " That the sale by Gould (Confederate States tax-col-" lector) to Cassell conferred on Cassell *no title* to the cotton " in question, unless said sale was *subsequently ratified* by plain-" tiff, or his agent, Gazan.

2d. " The sale by Gould to Cassell, *as one then acting as an* " *officer of the Confederate States government, conferred upon* " *Cassell no title to the cotton in question;* and if the jury," &c., &c., &c. To the giving of which instructions, the defendant excepted to, and asked for the following instructions which were refused by the court; viz.: —

1st. " The court instructs the jury that the Confederate States " were a government clothed with belligerent rights, and that " the acts of the officers in the military service of the said gov-" ernment during the late war were valid and binding, and that " imposition and collection of taxes, or levying contributions, " were a necessary incident to the full and perfect enjoyment " of such rights by such government, and that the acts of a tax-" collector under such government, exercising the functions of " his office, were valid and binding upon all the parties under " the authority of such government, with belligerent rights to " an equal extent with the impressments made by officers in the " field for the support of the armies of such government.

2d. " The court instructs the jury that Confederate States " currency constituted a good and sufficient consideration to " support a contract, and that the payment to Gould was the " payment of such money to plaintiff."

On the trial of this cause, no exception whatever was taken

to the sale by Gould, the tax-collector, as to its regularity, or the purchase of the cotton by Cassell. No complaint that said sale was not, in every respect, conducted properly and according to the tax-law of the Confederate States government, under which said cotton was sold; or that Gould was not the duly authorized tax-collector of the United States government, regularly appointed, with full power to levy and sell for non-payment of taxes, or that the taxes, for which said cotton was sold, were not due and unpaid; but that the Confederate States government was a creature of the rebellion, set up in opposition to the lawful authorities of the United States; in short, had no authority to impose, levy, or collect taxes; was not such a government as could impose these taxes, or enforce their collection; and that, therefore, the "sale by Gould to Cassell conferred on Cassell no title to the cotton in question, unless said sale was subsequently ratified by Backrack or his agent."

The first question therefore arises, in the language of the instructions, Did the "sale by Gould to Cassell, as *one then acting as an officer of the Confederate States government*, confer upon Cassell a title to the cotton in question"? We believe that by said sale the title was properly and legally transferred to Cassell, the appellant.

1st. Backrack and Cassell were both citizens of the Confederate States government, residing therein, and by word and act recognizing the authority of the government; indeed were *parties* to the *very law under which this tax-sale took place*, through their *representative in congress at Richmond;* and to such government (though a usurper) their temporary allegiance was due. It scarcely needs authority for this plain proposition. The principles of law, that *protection and allegiance are reciprocal*, should be sufficient. As to temporary allegiance, see Blackstone's Commentaries, vol. 1, book 1, marginal pages 370-1, where the following is laid down as the deductions of Sir Matthew Hale: "Though there be a *usurper* of the crown, yet it is *treason* for any subject, while the usurper is in the full possession of the sovereignty, to practise any thing against his crown and dignity: wherefore, although the *true* prince regain

the sovereignty, yet such attempts against the usurper have been afterwards *punished with death*, because of the breach of that *temporary allegiance* which was *due to him as king de facto.*"

Upon this point, John Quincy Adams remarks:—

"What would be the condition of every citizen of the resisting States? bound by the double duty of allegiance to the Union and to the State, he would be crushed between the upper and nether millstone, with the performance of every civil duty converted into a crime, and *guilty of treason by every act of obedience to the law.*"

The authorities upon this point could be enumerated to any extent. Wheaton's International Law particularly could be referred to, not by single quotations, but by pages; but as the Supreme Court, in the case of the *United States* v. *Rice*, 4 Wheaton, 246, has expressly sanctioned this doctrine, it would be useless to enumerate authorities. And here we may remark, that *temporary allegiance*, that is, obedience to law, settles this whole case; for the same authority also expressly declares, that the "*subsequent resumption* of authority of the United States can not *change* the *character of past transactions.*"

England and France particularly, have recognized this doctrine of temporary allegiance, and the struggles of the "white and red" roses of England are replete with this doctrine. It was, and is, the only safe doctrine; the only true rule which can be adopted; for otherwise, in the language of President Adams, "the performance of any civil duty could be converted into a crime, and every act of obedience to the law would be treason."

We, therefore, believe that this doctrine of temporary allegiance is too well settled now, to be questioned; and we again call especial attention to the necessary conclusion of this doctrine, which must settle this case. If temporary allegiance was due to the Confederate States government, obedience to the law and the constituted authorities for the time being is as positive as obedience to the law of an acknowledged government; the obedience due to the Confederate States government

was as full and perfect (though temporary) as obedience now to the United States government. Its being temporary does not lessen its dignity or magnitude, nor does it detract from its full and binding operation; it differs from the allegiance and obedience due to an acknowledged government only in its *duration*, but not in *its quality or binding force;* and we therefore respectfully suggest, that this law of the Confederate States government and the action of its duly authorized officers were fully as binding as the law or act of any officer of an acknowledged government.

2d. Because the Confederate States government was a "*de facto*" government, with all the rights and powers attaching thereto. The late war surely was not a loose, unorganized rebellion, but was formed by the States acting as sovereign powers, claiming not only the right "*de jure*," but, as a fact, did form a government, complete in all its parts, with every essential of a good and responsible government, demanding allegiance from its citizens, and, in return, giving them full protection. Not only was the government complete as a whole, but all its departments exercised their various functions; and the decisions of the United States Supreme Court, sustaining captures for violation of the blockade, is full authority that rebellion was no unorganized *émeute*, but a genuine out and out civil war, as the Circuit Court of the United States for Maryand, in a case not yet reported, have formally announced; not only that it was a civil war, but that all the consequences of a civil war attached,— non-intercourse between the citizens of the contending powers; and that no interest could be collected on debts previously existing, from the date of President Lincoln's first proclamation, to 13th June, 1865, the date of President Johnson's proclamation. To sustain captures for a violation of the blockade, is a war power only. As a fact, was the Confederate States government a *de facto* government? Our answer is, Its formation, its duration, and its history declare it. Chitty's Blackstone, book 1, vol. 1, pp. 370–1.

3d. Whether a *de facto* government or not, the Confederate States was a *belligerent* power, in possession of their territory,

with a defined boundary. As conqueror, and as conquerors, they can exercise the right to establish a military and civil government, enact laws, levy taxes, exact allegiance from citizens, &c. Gerasimo, 11 Moore, Prize cases, 101; *United States* v. *Rice*, 4 Wheaton, 246; Law Journal, 325; Thirty hhds. sugar, 9 Cr. 191. For without the right to make laws, to establish government, and to do and perform all things necessary and requisite thereto, among which is taxation, the greatest anarchy must necessarily prevail; neither life nor property would be safe; neither age, nor sex, nor religion would be the least safeguard, but the greatest anarchy and confusion must necessarily follow. Therefore " *ex necessitate rei,*" this principle must be true, however unfounded the claim and justice of the conquerors may be. 16 Howard, 164–190; 9 Howard, 615; 20 Howard, 177; *Am. Ins. Co.* v. *Carter*, 1 Peters, 542.

Moreover, the United States, by its action, recognizes the aforesaid powers of the Confederate States government, claiming to be the *successor* of the Confederate States government; and in the Prislan cotton case the vice-chancellor held that the United States were entitled to the cotton in the hands of Prislan (after and *only* after Prislan's lien was satisfied), because the claim of the United States was based, not *on capture*, but on the fact of the United States being *successor* to the Confederate States government.

Spain and England both delivered up vessels to the United States government on the same ground. United States government also claimed all cotton belonging to Confederate States government in the Southern States, — surely not on the ground of confiscation, but it must be as successor to the Confederate States government.

*E. J. Bowers* for defendant in error.

The first instruction given at the instance of the plaintiff in the court below contains no error. This instruction goes to the point of the validity of the sale made by Gould, claiming then to act therein as an agent and civil officer of the Confederate government, to pass the title to the cotton in question from

William H. Cassell *v.* Jacob Backrack.

the original owner, the present defendant in error, to Cassell, the plaintiff in error.

Various authorities are cited by counsel for the plaintiff in error, to support the validity of Gould's acts therein; and it is by them concluded, that such sale conferred on Cassell the absolute title to the cotton. Such authorities are not at hand, but I apprehend that, when examined, they will be found to go no farther than to assert the doctrine, even if that far, that while the acts of a government claiming to act as a *de facto government*, and of the officers of said government acting thereunder, are valid in matters where *a delivery* of the property has been made, and the said property *received* by the purchaser, and by him held, until peace is made between said government and the parent government with which the *de facto government* is then at war, and in which the *de facto* government is destroyed and abolished by the parent government, in the terms of capitulation and surrender, made by the victor (as was the case in the present instance), the law will not interfere to either reinstate the parties to their *former status* as to the rights of property conveyed by an officer of said *de facto* government.

In other words, if the *sale of property* by an officer of the *de facto* government be complete, and delivery thereof (of the property), whereby a *divestiture of the title* is made, and which is made to the purchaser, acquiesced in by the original owner, until such government is overthrown, then the law of the parent government will not interfere to give him a *right of action* against the purchaser to recover the same. Nor will it interpose to give the purchaser a *right of action* against the original owner, to recover the property bought at said sale. It will leave the parties as it found them, not enforcing the claim of the one or the other, if the *divestiture* of title had been *complete*, and acquiesced in by the original owner. But the court will bear in mind that there was no divestiture of title in this case. *Delivery* of the cotton was never made by Gould to Cassell, and without such delivery there could be no complete divestiture of the title held by Backrack. Gould's testimony, as does that of Dinkins, clearly shows the pretended sale only.

They, Gould and Dinkins', each show that the cotton was the property of Backrack, and that it was at Dinkins, where it continued to remain until some time after the surrender, when Cassell, after having conferred with Gazan, the agent of Backrack, relative to it, and from him ascertained his unwillingness to give up *possession* which he still held, and that he had never acquiesced in or ratisfied Gould's action in said sale, armed himself for the occasion with his shot-gun, and repaired to Dinkins' premises, when he *forcibly* took possession of the cotton, against the consent of Backrack, as previously made known to him by Gazan, his agent. Here was an act upon his part, not only in violation of law, but oppressively, towards the defendant in error. Property to which he held a *clear title* by purchase, and of which he then held *possession*, was wrested from him by the oppressive act of Cassell, and he dare not interfere to prevent it, at the *peril* of his *life* or great personal injury. The fact of his arming himself for the occasion establishes the *animus* with which he went upon Dinkins' premises, and for such he should be held accountable as a wrong-doer. He acquired *no title* to the cotton by his previous purchase, because the sale was wanting in an essential particular to pass such title, *i.e.*, the *delivery* of the same; and, although a valid sale (which the present was not) may be perfect in all other respects, yet if the chattel or thing purchased, being personal or perishable in its nature, still remain in *the possession* of the original owner, the *divestiture* of title is not *complete*. See Story on Sales, §§ 276, 278, 287, 296.

It will be remembered, that the United States goverment never recognized the Confederate government as a *de facto government*, during the existence of the war between them, and that at the surrender there was a total abolition of said government, with all its antecedent laws and customs. The entire action of the government was not only annulled by the *parent government*, but wiped out and destroyed, as well in the *civil* as in the military department. How then could Cassell assert any title to the cotton in question, under the sale by Gould, as a civil officer of the Confederate States, when such sale was never

perfected by a *delivery* of the cotton, and never ratified by either Backrack or his agent?

Nor has the United States ever so recognized such as a *de facto government* in any respect since the surrender, only so far as to style and treat the citizens living thereunder as "*belligerents*," and to define their rights as such "*belligerents*" in cases wherein the United States and a citizen of the Confederate government were parties litigant, or citizens of said governments were engaged in litigation, the one against the other. They have never recognized the right or legitimate power of the several States to organize a separate government in hostility to the government of the United States, to *levy and prosecute* a *war* against the same, or *to tax* the citizens of any one of the seceding States to raise material or means with which to prosecute said war, but, upon the contrary, have, time and again, and in unmistakable and unmeasured terms, expressly repudiated the same. One of the first requirements made by the government of the State of Mississippi after the surrender was, that the people thereof, in *convention assembled*, should abrogate and repeal the ordinance of secession passed by the convention of 1861, which was done by the convention of 1865.

JEFFORDS, J., delivered the opinion of the court.

The declaration in this case contains two counts. The first is in trespass, and alleges that Cassell, the defendant below, on the 6th day of June, 1865, with force and arms, broke and entered the close of one A. H. Dinkins, in police district number three, in Madison county, and took and carried away from said close two bales of cotton belonging to the plaintiff, Jacob Backrack, the same being of the value of five hundred dollars, and to the damage of the plaintiff in the sum of one thousand dollars.

The second count is in trover, and alleges that on the 5th day of June, 1865, the defendant wrongfully converted to his own use two bales of cotton belonging to the plaintiff, to the damage of the plaintiff in the sum of one thousand dollars.

Cassell, the defendant below, pleaded the general issue, de-

fending the wrong and injury, &c., and giving notice that under his plea of the general issue he would offer in evidence on his part, that, at a tax sale regularly conducted by the Confederate States government tax-collector, for non-payment of certain taxes due the Confederate States government by said Backrack on certain cotton, of which these two bales of cotton were a part, he, the said Cassell, purchased the said two bales at said sale, and paid for the same, he being the highest and last bidder for the said two bales of cotton; and that said sale took place on or about the 17th day of June, 1864. The defendant also gave notice of set-off, and accord and satisfaction. The cause was submitted to a jury, and they returned a verdict in favor of the plaintiff, for the sum of one hundred and fifty-one $\frac{90}{100}$ dollars; and, thereupon, the defendant below moved for a new trial for the reasons stated in the record, and the motion having been considered by the court, said motion was overruled and judgment rendered on the verdict, in favor of the plaintiff, to which ruling and action of the court the defendant excepted, and tendered his bill of exceptions. To reverse which judgment this writ of error is now prosecuted. On the trial of this case in the Circuit Court, the following instructions were requested and given for the plaintiff : —

1. "The court instructs the jury, that the sale by Gould to Cassell conferred on Cassell no title to the cotton in controversy, unless said sale was subsequently ratified by plaintiff, or his agent, Gazan."

2. "The sale by Gould to Cassell, as one then acting as an officer of the Confederate States government, conferred upon Cassell no title to the cotton in question," &c. The giving of these instructions, and refusal of the court to grant a new trial, are assigned for error.

The official character of Gould, as the regularly authorized tax-collector for the Confederate States government, does not seem to have been denied or questioned at the trial; nor was any objection raised as to the regularity of the sale made by Gould as such tax-collector. It is asserted and not denied, that the sale took place in June, 1864, whilst the Confederacy re-

mained intact, and its authority and power irresistible in the greater portion of the State of Mississippi. The proof shows that the sale was of two *particular bales of cotton, designated by number ; that the purchase-money was paid in full, by the purchaser at the date of the sale. Nothing further remained to be done by either party, in order to confer a perfect and complete title to the property sold on the vendee.* As between the vendor and vendee, this transaction was fully executed and closed, and the rights of the parties irrevocably fixed, when the purchase-money was paid. It can make no difference that the vendee allowed the cotton to remain at the place where he bought it, as by leaving it there it remained entirely at his own risk, and in contemplation of law was in his constructive or actual possession from the date of the sale. It is alleged by the plaintiff below, that the defendant below, when he removed the cotton which he bought, took one wrong bale, but there is no legal proof on this point whatever, in the case. In the absence of proof, we are bound to presume that he removed the *precise* two bales of cotton which he purchased, as the law never presumes the commission of a trespass or wrong.

It is a conceded fact, that both Backrack and Cassell were residents within, and adherents to, the Confederate States government, during the continuance of the late rebellion. Backrack now, however, that he has played and lost, insists that the Confederacy never was a government at all, not even so far as its own subjects and adherents were concerned, and, as a necessary legal consequence, never had any authority to impose and collect taxes from its own citizens.

The question at once arises, What was this so-called Confederate States government? Was it in all respects, and for all purposes, a disorganized mass, a disorderly and irresponsible mob? Or rather, was it not for certain purposes, and with reference to certain persons and parties, a government in fact for the time being?

We are well aware that in respect to the United States government and its loyal citizens, this is now no longer a question open for discussion. It is now fully and finally settled by every

department of the Federal government, beyond all future controversy, that in relation to the United States, the late Confederacy was not a government either *de jure* or *de facto*, within the meaning of these terms as used in the law of nations.

The pretensions of nationality set up by the Confederacy were most steadily and constantly denied by the United States, from the beginning to the close of the recent civil war. This was the very point in issue. It was the great central subject-matter of controversy between the contending parties.

The policy adopted by the United States government, and all the several departments, in all its dealings with this question, in whatever form or shape it presented itself, was adhered to and pursued with a tenacity of purpose which challenges the admiration of the world. It was never relinquished or even lost sight of for a single moment of time. It was maintained with a firmness and consistency unparalleled in the political history of nations, reaching the sublime in statesmanship.

But does it necessarily follow, that because the pretended Confederate government was no government so far as the United States and its loyal citizens were concerned, that it was no government as to those who organized, put in motion, and adhered to its fortunes during its continuance? We think not.

It is well known that, after the breaking out of hostilities, that those who resided within Confederate territory not only acknowledged allegiance to the established central government, but with an unanimity and alacrity never before recorded in history, an entire people rushed to the support of the Confederate standard. The old State governments were overthrown, and speaking from the Federal stand-point, usurping governments were erected in their stead, and the Confederate States government, with sovereign power over all the eleven seceding States, was formed by the almost unanimous voice of an entire people. These governments, both State and central, were maintained and adhered to, for a period of more than four years, with unmatched devotion.

During all this time the internal and domestic concerns of life and business flowed on in their accustomed channels.

Transactions involving thousands of millions of dollars had been fully consummated; innumerable contracts entered into and executed by the parties in interest; thousands of persons united in marriage, and children born of such marriages; the Reaper Death having been unusually busy during this period, had "heralded his millions to their homes in the dim land of dreams;" estates of decedents and minors had been administered; real estate and personal property of countless value had changed hands; courts were held, judgments rendered, and decrees pronounced and executed, — between the commencement and close of the war, under the assumed sanction of government and law.

We cannot now imagine any just political reason, or sound principle of State policy, which demands that we should hold, that as between the citizens of the Confederacy and the Confederate States government, there was no government whatever. This tribunal will take judicial notice of the fact as a matter of public notoriety and history, that the inhabitants of the Confederacy were not reduced to an absolute condition of barbarism, anarchy, and chaos during the continuance of the rebellion.

We are inflexibly averse to harrowing up the bones and ashes of the late unfortunate civil strife. Whenever we can do so, without departing from the straight path of duty, we feel constrained not to disturb their repose. Not by any word or deed of ours would we knowingly renew or perpetuate a single unpleasant recollection of the deplorable past.

Whilst we admit that the public policy of the United States government holds that the Confederacy and the State governments organized thereunder were unlawful combinations, and their acts illegal and void so far as they affect that government and its loyal citizens; still in reference to all matters of internal, private, and domestic import, indifferent to the government and laws of the United States, we are satisfied it is our duty to hold that so far as the inhabitants of the Confederacy were concerned, it was a government in fact for the time being, for the purpose of conserving fully the private rights of persons and

property, and for the protection of individuals from liability and punishment for obeying the laws of such government. To hold differently, would overturn, without particularizing, almost every transaction, whether of a public or private nature, which transpired during the supremacy of the Confederacy, and would lead to consequences productive of incalculable mischief.

On the other hand, we believe we can see many satisfactory and controlling reasons why, as between the parties to, and the citizens of, the central and State governments composing the Confederacy, they were governments in fact, in all matters relating to their internal domestic affairs; and especially should this be so with reference to past and executed transactions.

We are of opinion that for reasons of public policy alone, if for no other, the courts of the country should withhold their active interference in all such cases. If it be true, as we have attempted to demonstrate (and we are confident we have made no mistake in this), that the Confederate States government, and the several State governments composing the central power, were "unlawful combinations of persons," confederating together for illegal and criminal objects merely, it seems to us that it follows irresistibly that all who formed part of and adhered to these unlawful organizations were not only *particeps criminis*, but were in a strict legal sense *in pari delicto*, and that, therefore, as between all parties standing in this relation to each other, the courts of the legitimate government, when restored, upon well-established and familiar principles of law, should deny their active aid to either party, and leave them in the exact condition in which they find them.

We are not aware that this question has been the subject of judicial investigation either in the Federal or State tribunals of the country; and it is a matter of regret that we have not been able to fortify our position by precedent and authority. We have, however, arrived at the present conclusion after the most careful and deliberate consideration, in full view of the vast importance of the question to be determined.

There is nothing in the position assumed in this case in con-

flict with the principles intended to be discussed and adjudicated by the opinion of the court of the present term, in the case of *Samuel B. Thomas, Sheriff, &c.*, v. *William B. Taylor*.

In that case, the subject-matter of the controversy was *executory ;* whereas, in the case at bar, it had been wholly *executed*.

This opinion is designed to be limited in its bearing to matters and transactions, not affected by the constitution and laws of the United States, and which have been *entirely consummated*, by the Confederate States government upon its own citizens, or to subjects of controversy arising between such citizens and executed by them, during the time when that government was claiming to exercise, and in point of fact did exercise, sovereign power over the territory within its control.

For the reasons here stated, we are of opinion that the instructions given by the court below were erroneous. Its judgment must, therefore, be reversed; the verdict set aside; a *venire de novo* awarded, and the cause remanded.